**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

IRON WORKERS LOCAL NO. 60 ANNUITY PENSION FUND, by Gary
E. Robb and Sam Conley, as Trustees; IRON WORKERS LOCAL UNION
NO. 60 TRAINING, SKILL IMPROVEMENT, EDUCATION AND
APPRENTICESHIP FUND, by Gary E. Robb and Sam Conley, as
Trustees; CENTRAL NEW YORK IRONWORKERS AND EMPLOYERS
COOPERATIVE TRUST, by Gary E. Robb and Sam Conley, as Trustees;
IRON WORKERS LOCAL UNION 60 SUPPLEMENTAL BENEFIT
PLAN, by Gary E. Robb and Sam Conley, as Trustees; IRON WORKERS
LOCAL UNION NO. 60, by Gary E. Robb, as Business Manager; IRON
WORKERS DISTRICT COUNCIL OF WESTERN NEW YORK AND
VICINITY WELFARE FUND, by Suzanne Ranelli, as Administrative
Manager; IRON WORKERS DISTRICT COUNCIL OF WESTERN NEW
YORK AND VICINITY PENSION FUND, by Suzanne Ranelli, as
Administrative Manager; IRON WORKERS DISTRICT COUNCIL OF
WESTERN NEW YORK AND VICINITY ANNUITY FUND, by Suzanne
Ranelli, as Administrative Manager; UPSTATE IRONWORKER
EMPLOYERS' ASSOCIATION, INC., by John Gorczynski, as President;
UPSTATE NEW YORK DISTRICT COUNCIL OF IRON WORKERS
EMPLOYERS COOPERATIVE TRUST, by Garrett Geartz and John
Linehan, Jr., as Trustees; IRON WORKERS LOCAL UNIONS NOS.
33/440 SUPPLEMENTAL BENEFIT FUND, by Garrett Geartz and John
Linehan, Jr., as Trustees; IRON WORKERS LOCAL NO. 33 JOINT
APPRENTICESHIP COMMITTEE APPRENTICE TRAINING FUND, by
Garrett Geartz and John Linehan, Jr., as Trustees; IRON WORKERS
LOCAL UNION NO. 33, by John Linehan, Jr., as Business Manager;
INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND
ORNAMENTAL IRON WORKERS LOCAL UNION NO. 440 JOINT
APPRENTICE TRAINING FUND, by Thomas Thomas and John
Gorczynski, as Trustees, and IRON WORKERS LOCAL UNION NO. 440,
by Thomas Thomas as Business Manager,

<table>
<tr><td style="text-align:center">Plaintiffs,</td><td style="text-align:right">5:15-cv-54<br>(BKS/DEP)</td></tr>
</table>

v.

SOLVAY IRON WORKS, INC., JOHN B. MAESTRI, Individually and as
an Officer and Shareholder of Solvay Iron Works, Inc., BERT MAESTRI,
Individually and as an Officer and Shareholder of Solvay Iron Works, Inc.,
SHEILA MAESTRI, Individually and as an Officer and a Director of
Solvay Iron Works, Inc., ALFRED R. CHEMOTTI, JR., Individually and
as an Officer and Shareholder of Solvay Iron Works, Inc., KELLY C.
ORMSBY, Individually, as an Officer of Solvay Iron Works, Inc. and as an
Officer of Ormsby Iron, LLC, and ORMSBY IRON, LLC,

Defendants.

---

**APPEARANCES:**

Blitman & King LLP
Jennifer A. Clark, of Counsel
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204-1415
*Attorneys for Plaintiffs*

Hancock Estabrook, LLP
Daniel B. Berman
Whitney M. Kummerow
1500 AXA Tower I
100 Madison Street
Syracuse, New York 13202
*Attorneys for Defendants John Maestri and Sheila Maestri*

Kelly C. Ormsby, pro se
Fulton, New York

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

On January 16, 2015, Plaintiffs Iron Workers Union Nos. 60, 33, and 440 (the "Unions")

and a number of the Iron Workers benefit funds ("Plaintiff Funds"), by their trustees, managers,

and officers, filed a Complaint against Defendant Solvay Iron Works, Inc., John B. Maestri, Bert

Maestri, Sheila Maestri, Alfred R. Chemotti, Jr., Frank Petro,[1] Kelly C. Ormsby, and Ormsby

Iron, LLC,[2] alleging that Defendants violated, *inter alia*, sections 406, 409, and 515 of the

Employment Retirement Income Security Act of 1974 ("ERISA") (codified at 29 U.S.C.

§§ 1106, 1109, 1145) and New York state law by diverting assets of the Plaintiff Funds and

---

[1] All claims against Defendant Frank Petro were dismissed following his death. (Dkt. No. 158).

[2] Following the commencement of this action, Defendant Ormsby Iron, LLC filed a Chapter 7 bankruptcy petition; on August 4, 2016, United States Magistrate Judge David E. Peebles entered an order staying all claims against Defendant Ormsby Iron, LLP until further notice. (Dkt. No. 98).

failing to timely remit fringe benefit contributions and deductions. (Dkt. No. 1). Plaintiffs filed

an Amended Complaint on May 14, 2015.[3] (Dkt. No. 63).

Defendant Solvay Iron Works, Inc. neither filed an answer nor appeared in this action,

and Plaintiffs moved for default judgment. (Dkt. No. 90). On March 28, 2017, the Court granted

Plaintiffs' motion and entered partial judgment against Defendant Solvay Iron Works on the

First, Second, Third, and Fourth Causes of Action in the sum of $755,977.68 in contributions,

deductions, interest, liquidated damages, and attorney fees and costs. (Dkt. No. 134, at 22).

Presently before the Court are: (1) Defendant Sheila Maestri's motion under Rule 56 of

the Federal Rules of Civil Procedure for summary judgment (Dkt. No. 161); (2) Plaintiffs'

motion under Rule 56 for summary judgment against Defendants Sheila Maestri, John Maestri,

and Kelly Ormsby (Dkt. No. 163);[4] and (3) Plaintiffs' supplemental application for attorneys'

fees and costs (Dkt. No. 148), which the Court authorized in its Memorandum-Decision and

Order granting Plaintiffs' motion for default judgment (Dkt. No. 134). Plaintiffs oppose Sheila

Maestri's motion for summary judgment, Defendants[5] oppose Plaintiffs' motion for summary

---

[3] Defendants Ormsby and Ormsby Iron, LLC filed a Crossclaim against Defendants John Maestri and Solvay Iron Works. (Dkt. Nos. 66, 67). Defendant John Maestri filed a Crossclaim against Defendants Ormsby and Ormsby Iron. (Dkt. Nos. 74, 75). Defendant Chemotti, Jr. filed an Answer and a Counterclaim against all Plaintiffs. (Dkt. No. 73).

[4] Plaintiffs have not sought summary judgment against Defendants Chemotti or Bert Maestri.

[5] As Defendant Kelly Ormsby is proceeding pro se, the Court directed Plaintiffs to serve Ormsby with a "Notice to Pro Se Litigants of the Consequences of Failing to Respond to a Summary Judgment Motion," as required by Local Rule 56.2, and extended the response and reply deadlines to enable Defendant Ormsby to respond to Plaintiffs' motion for summary judgment. (Dkt. No. 165). Ormsby subsequently filed a notarized letter opposing summary judgment. (Dkt. No. 173). It states in relevant part:

> The depositions of Gary Robb, Alfred Chemotti, Laura Michalski, Sarah Shatrau, and Samanth[a] Spataro all state that John Maestri was solely responsible for the financial decisions made with respect to Solvay Iron Works.

> I oppose the summary judgment motion as it is written against me. I am not responsible for this debt. If I can't collect the receivables that were due to Solvay Iron Works, how can I be responsible to pay them? The owners failed to collect their receivables and pay off their debt. I had received letters from their lawyers saying that what was what they were going to do at the time that Solvay Iron Works closed. John Maestri fired them, I have had no control over any of that, to include paying the bills. That was all John Maestri's responsibility.

judgment, and there is no opposition to Plaintiffs' supplemental application. For the following

reasons, Sheila Maestri's motion for summary judgment is granted in part and denied in part,

Plaintiffs' motion for summary judgment is granted in part and denied in part, and Plaintiffs'

supplemental application for attorneys' fees and costs is granted.

## II.    BACKGROUND[6]

### A.    Plaintiff Funds

The Plaintiff Funds are jointly-administered benefit plans maintained by employee

organizations and employers pursuant to agreements and declarations of trust to provide, *inter*

*alia*, health, retirement, unemployment, and training benefits to eligible participants. (Dkt.

No. 163-1, ¶¶ 1–11; 174-1, ¶¶ 1–11). The Plaintiff unions are labor organizations located in

Rochester, Whitesboro, and Syracuse, New York. (Dkt. No. 163-1, ¶¶ 12–14; 174-1, ¶¶ 12–14).

### B.    Solvay Iron

Defendant John Maestri ran Solvay Iron from 1948, when it opened, until it closed in

September 2013, (Dkt. No. 174-7, at 8), and at all relevant times was the chief executive officer,

majority shareholder, and a member of Solvay Iron's board of directors. (Dkt. No. 163-10, ¶ 12).

In the fall of 2011, John Maestri hired Kelly Ormsby as a consultant to review Solvay Iron's

"financial books and records and its shop and field procedures." (Dkt. No. 163-10, ¶ 9). Ormsby

discovered that Solvay Iron "was millions of dollars in debt[7] and [that] it was not paying its

creditors" and "concluded that it could not overcome th[e] deficit." (Dkt. No. 163-10, ¶ 9). In

November 2011, Ormsby met with John Maestri and his daughter Sheila Maestri (who was not

yet formally associated with Solvay Iron), advised them of his assessment, and recommended

---

(Dkt. No. 173, at 1).

[6] The facts have been drawn from the parties' statements of material facts (Dkt. Nos. 161-11, 163-1), responses thereto (Dkt. Nos. 167; 174-1), and the attached exhibits.

[7] Kelly Ormsby testified that Solvay Iron was approximately $4.5 million in debt. (Dkt. No. 163-10, at 25).

that Solvay Iron cease operations and close. (Dkt. No. 163-10, ¶ 10). According to Ormsby, John Maestri responded "that he would not close his business, wanted to save his company, and asked that [Ormsby] help." (*Id.*).

In December 2011, Ormsby, with John Maestri's authorization, entered into a collective bargaining agreement[8] with Plaintiffs obligating Solvay Iron to remit contributions and deductions to the Plaintiff Funds for each hour of bargaining unit work, i.e., iron workers' work.[9] (Dkt. No. 63; Dkt. No. 163-1, ¶ 15; Dkt. No. 163-8, ¶ 13; Dkt. No. 174-1, ¶ 15).

At a January 28, 2012 meeting of Solvay Iron's board of directors, Ormsby became Solvay Iron's chief operating officer[10] "with full authority over all operations." (Dkt. No. 163-10, at 272). The board also approved John Maestri's motion to: (i) appoint Sheila Maestri as "Vice Chairman of the Board and secretary of the corporation"; and (ii) enable her to "immediately assume responsibilities as Chairman of the Board and Chief Executive Office[r] of

---

[8] John Maestri authorized Ormsby to sign the CBA on behalf of Solvay Iron. (Dkt. No. 163-8, ¶ 13).

[9] Under the IW60 Agreement, Solvay Iron was "bound by the terms and conditions, rules and regulations of the Restated Agreement and Declaration of Trust of the IW60 Pension Fund, the Restated Agreement and Declaration of Trust of the IW60 Training Fund, and the Restated Agreement and Declaration of Trust of the IW60 SB . . . the Restated Agreement and Declaration of Trust of the Local 60 E.C.T., and the IW60 Benefit Funds' and Local 60 E.C.T.'s Collections Policy" (collectively the "IW60 Funds, Trust, and Collections Policy"). (Dkt. No. 63, ¶ 33). The IW60 Funds, Trust, and Collections Policy obligate Defendant to remit contributions for each hour of bargaining unit work its employees perform. (*Id.* ¶ 34). The IW60 Agreement requires Defendant to deduct stipulated sums for each hour worked from certain employees' wages and pay these sums (Union dues) to Local 60. (*Id.* ¶ 35). The IW60 Funds, Trust, and Collections Policy and IW60 Agreement required Solvay Iron to file remittance reports and remit contributions and deductions owed by the fifteenth "day of the month following the month during which the hours were worked." (*Id.* ¶ 36).

Under the IW12/33/440 Agreement and IW60 Agreement, Solvay Iron was "bound by the terms and conditions, rules and regulations" of the Restated Agreements and Declarations of Trust of the [IWDC] Welfare Fund, Pension Fund, and Annuity Fund, and the IWDC Funds' Collections Policies, the Agreement and Declaration of Trust of the 33/440 Supplemental Benefit Fund, the 33/440 Supplemental Benefit Fund Collections Policy, the Agreement and Declaration of Trust of the 33 Training Fund, the Restated Agreement and Declaration of Trust of the 440 Training Fund, and the Agreement and Declaration of Trust of the Iron Workers Employers Cooperative Trust ("IWECT"). (Dkt. No. 63, ¶ 49). These Agreements, Funds, and Trusts required Solvay Iron to remit contributions and deductions for each hour of bargaining unit work its employees perform by the fifteenth day of each month. (*Id.* ¶¶ 50–52).

[10] Ormsby became president of Solvay Iron in June 2012.

the Corporation" in the event John Maestri was "temporarily or permanently unable to fulfill his role" as CEO.[11] (Dkt. No. 163-10, at 272; Dkt. No. 161-11, ¶ 2).

Ormsby states that in 2012, despite his efforts to turn the company around, growing debt, an underbid project, and the death of a Solvay Iron employee at a construction site[12] weakened Solvay Iron's finances. (Dkt. No. 163-10, ¶¶ 25–30). Ormsby further states that in May 2012, he told John and Sheila Maestri that "Solvay Iron would need to sell $12 million worth of work and make a twenty percent (20%) profit in 2013 to cover the debt." (Dkt. No. 163-10, ¶ 28).

By July 2013, Solvay Iron had $5,000 in its general account, $2,000 in its "payroll account," and $2.3 million in debt. (Dkt. No. 163-10, ¶ 40). Ormsby tendered a resignation from Solvay Iron on July 5, 2013, (Dkt. No. 163-1, ¶ 20), but remained involved in the company. (Dkt. No. 174-1, ¶ 20).

On August 29, 2013, John and Sheila Maestri and Ormsby met with Plaintiffs to discuss the debt. (Dkt. No. 163-8, ¶ 18). Plaintiffs advised these Defendants that Solvay Iron's debt, including interest and liquidated damages, exceeded $1 million. (Dkt. No. 163-10, ¶ 41). According to Plaintiffs, from June 2012 through September 30, 2013, "Solvay Iron was paid over $8.6 million by its customers for its employees' work." (Dkt. No. 163-1, ¶ 27; Dkt. No. 174-1, ¶ 27). Plaintiffs claim that Defendants nevertheless failed to pay $673,824.75 in contributions for hours worked by Solvay Iron employees, (Dkt. No. 163-1, ¶ 22; Dkt. No. 174-1, ¶ 22), and "untimely remitted $263,092.07 in contributions to Plaintiffs for hours worked by [Solvay Iron's] employees" during that same time period. (Dkt. No. 163-1, ¶ 23; Dkt. No. 174-1, ¶ 23).

---

[11] In 2009, John Maestri gave Sheila Maestri power of attorney over his personal matters in the event he became incapacitated. (Dkt. No. 167, at 6; Dkt. No. 163-3, 231–37).

[12] Following the employee's death, Solvay Iron's liability and workers compensation insurance premium increased by more than $500,000 per year. (Dkt. No. 163-10, ¶ 30).

Solvay Iron ceased operations on or about September 27, 2013. (Dkt. No. 163-10, ¶ 42). Sheila Maestri "officially resigned from the Board on February 20, 2014."[13] (Dkt. No. 161-1, ¶ 11).

## C.   Individual Defendants – Roles at Solvay Iron

Plaintiffs claim that John and Sheila Maestri and Kelly Ormsby were fiduciaries with respect to plan assets and are therefore liable for the unpaid and untimely contributions and deductions. Each of these Defendants deny having fiduciary status.

### 1.   John Maestri

Defendant John Maestri is the former Chief Executive Officer of Solvay Iron Works. (Dkt. No. 161-11, ¶ 1). It is undisputed that John Maestri had authority and control over Solvay Iron's bank accounts. (Dkt. No. 163-1, ¶ 41; Dkt. No. 174-1, ¶ 41). Plaintiffs contend that John Maestri determined which of Solvay's Iron's bills to pay and when to pay them and that he was aware both of Solvay Iron's "debt with Plaintiffs" and that Solvay Iron was "paying other creditors instead of remitting the [plan assets] to Plaintiffs." (Dkt. No. 163-1, ¶¶ 34–36). In his affidavit, Ormsby asserts that:

> Defendant J. Maestri made [final] decisions and authorized all payments to creditors. [Ormsby] would review the accounts payable log and give Defendant J. Maestri the log with [Ormsby's] suggestions of which creditors to pay and how much to pay the creditors. Defendant J. Maestri would review the log, make a check mark next to those bills he wanted to pay, strike any bills he did not want to pay and, on occasion, he would write the dollar amounts to be paid to the creditor. [J. Maestri] would return the accounts payable log to [Ormsby] or to Controller Sarah Shatrau[14] with a request to issue the checks.

---

[13] Sheila Maestri states that "[a]lthough the company had been shut down by that time, [she] was not aware that [she] still had to take formal steps to resign until then." (Dkt. No. 161-1, ¶ 11).

[14] As controller, Shatrau was responsible for the oversight of accounts receivable, accounts payable, and payroll. (Dkt. No. 163-12, at 17).

(Dkt. No. 163-10, ¶ 16). Ormsby avers that John Maestri "decided to pay the insurance premiums, material suppliers, the employees' wages, himself and other overhead expenses but to leave employees' fringe benefit contributions and Plaintiffs unpaid." (*Id*. ¶ 17). Ormsby states that John Maestri elected to "pay the insurance premiums since [Solvay Iron] could not operate without insurance" and instructed him to send Plaintiffs $10,000 "'here or . . . there' to keep them quiet." (*Id*. ¶ 31).

John Maestri disputes having this level of control over Solvay Iron's accounts payable and asserts that accounts payable were Ormsby's responsibility. (Dkt. No. 174-1, ¶¶ 36–40). In support of this assertion, John Maestri cites the March 16, 2013 board minutes, which state: "Accounts payable system discussed. Unanimous agreement that [Ormsby] is ably handling the acc[oun]t[s] payable." (Dkt. No. 174-3, at 36). The minutes further state: "It was suggest[ed] that [John Maestri] refer invoice issues to [Ormsby] for detailed attention." (Dkt. No. 174-3, at 36).

### 2.    Sheila Maestri

Sheila Maestri was the secretary and treasurer of Solvay Iron's board of directors from January 2012 until February 2014. (Dkt. No. 163-10, at 272; Dkt. No. 161-11, ¶ 2; Dkt. No. 161-1, ¶ 11). It is undisputed that she was not a shareholder, owner, or employee of Solvay Iron, and that she did not receive a salary or any employee benefits; indeed, she is a registered nurse and worked full time as a professor of nursing during the time period relevant to this action. (Dkt. No. 161-11, ¶¶ 2–4; Dkt. No. 163-3, at 168–69). Sheila Maestri avers that the only remuneration she "ever received from Solvay Iron . . . was payment of a Christmas bonus one year for Board members." (Dkt. No. 161-1, ¶ 15). In her declaration, Sheila Maestri states that she had "no role in the management of Solvay Iron's day-to-day operations" and "never supervised Solvay Iron employees." (Dkt. No. 161-1, ¶ 5). Sheila Maestri further states that she had no, and did not exercise any, "discretion, authority or control over Solvay Iron's assets" or "over which of

Solvay Iron's creditors were paid or not paid." (Dkt. No. 161-1, ¶¶ 6–7). As a board member, Sheila Maestri "never determined the compensation or working conditions for Solvay Iron employees." (Dkt. No. 161-11, ¶ 5; Dkt. No. 167, ¶ 5). Sheila Maestri testified that she had power of attorney "to be able to conduct business on [John Maestri's] behalf if he becomes incapacitated," (Dkt. No. 163-3, at 171), but maintains that she had no authority or control over Solvay Iron's bank accounts or finances—noting that Ormsby testified that "as far as [he] knew," Sheila Maestri "wasn't authorized on paper to do anything." (Dkt. No. 163-10, at 154; Dkt. No. 161-11, ¶ 8; Dkt. No. 167, ¶ 8). Sheila Maestri had "no duties related to the contracts signed by Solvay Iron, particularly in relation to agreements made with Plaintiffs in this action." (Dkt. No. 161-11, ¶ 9; Dkt. No. 167, ¶ 9).

In her declaration, Sheila Maestri describes her duties with respect to Solvay Iron as follows:

> I took meeting minutes at the Board meetings and on several occasions discussed irregularities in the Solvay Iron records with Solvay Iron's external accountants. For example, it was alleged that the former Secretary and Treasurer of Solvay Iron was stealing from the company. Solvay Iron's external accountants investigated the matter and I discussed their findings and opinions with them. There was nothing ordinary about this in the sense of Solvay Iron's normal business operations and it had nothing to do with the payment or non-payment of any amounts owed to the Plaintiffs.

(Dkt. No. 161-1, ¶ 16).

Plaintiffs (and Ormsby) view Sheila Maestri's role differently. Plaintiffs assert that Sheila Maestri was authorized to assume the responsibilities of board chairperson and CEO of Solvay Iron if John Maestri was unable to fulfill these roles. (Dkt. No. 167, at 5–6; Dkt. No. 163-10, at 272). Further, noting that John Maestri had given Sheila Maestri power of attorney, Plaintiffs assert that when John Maestri "was unable to act," Sheila Maestri "had the ability to exercise

authority and control over [Solvay Iron's] bank accounts and finances." (Dkt. No. 163-1, ¶ 42; Dkt. No. 163-3, at 230–237; Dkt. No. 163-3, at 171).

Plaintiffs and Ormsby contend that Sheila Maestri was aware of Solvay Iron's financial records as she reviewed them on "a regular basis." (Dkt. No. 161-11, ¶ 8; Dkt. No. 167, ¶ 8). Ormsby avers that Sheila Maestri asked him to "keep her aware" of "John Maestri's business and Solvay Iron's business," and that he met with Sheila Maestri monthly "to review the finances of the Corporation and its financial records." (Dkt. No. 163-10, ¶ 21). Ormsby states that he "often complained" to Sheila Maestri that "her father [John] Maestri had underbid projects," that Solvay Iron "was not generating enough income to pay bills," and that John Maestri "was not listening to [Ormsby's] advice," and Ormsby asked her to "address the situation with her father." (Dkt. No. 163-10, ¶ 21). Ormsby avers that because either he or John Maestri presented an accounts payable log reflecting "the debt with the Plaintiffs" to the board at (or before) every monthly meeting, Sheila Maestri "knew how much money was in the bank and knew about [Solvay Iron's] outstanding bills." (Dkt. No. 163-10, ¶ 32).

Plaintiffs claim that Sheila Maestri also had a role in determining how Solvay Iron spent its money and which of its creditors to pay. In support of their claim, Plaintiffs refer to evidence that Sheila Maestri approved payment of an employee's college tuition, (Dkt. No. 163-12, at 54), and directed payment to two creditors, (*id.* at 55 (directing payment to Mackenzie Hughes); Dkt. No. 161-7, at 3 (telling Solvay Iron controller Sarah Shatrau that she wanted "to make sure [Ormsby] gets paid back for what he's paid for fuel. Get him paid back this week if we can afford it")). Ormsby likewise claims that Sheila Maestri was involved in Solvay Iron's payment of creditors—asserting that she paid Solvay Iron's insurance premiums from her personal account; advanced money to Solvay Iron from her father's account; suggested which bills to pay;

authorized payment of certain bills and expenses; and had influence over her father.[15] (Dkt. No. 163-10, ¶ 20; Dkt. No. 167, ¶ 3).

### 3.    Kelly Ormsby

Plaintiffs and John and Sheila Maestri assert that as chief operating officer, Ormsby had "certain duties concerning collection of [Solvay Iron's] accounts receivables and payment of [Solvay Iron's] bills." (Dkt. No. 163-1, ¶ 21; Dkt. No. 174-1, ¶ 21). John Maestri contends that he "relinquished control over operations of Solvay Iron when Mr. Ormsby came on board in late 2011" and notes that Ormsby "signed many contracts on behalf of Solvay Iron . . . including the collective bargaining agreements with the unions." (Dkt. No. 174, at 14; Dkt. No. 163-10, at 69). During his deposition, John Maestri testified that he and Ormsby discussed Solvay Iron's finances regularly, including its outstanding bills, but that they did not discuss which creditors to pay, because Ormsby "did that." (Dkt. No. 174-7, at 20).

Ormsby avers that his role at Solvay Iron was to "assist in developing a turnaround plan and to determine the volume of work needed to cover" Solvay Iron's debt, but states that he "did not want to make any financial decisions and . . . would not make those decisions." (Dkt. No. 163-10, ¶ 11). Ormsby acknowledges that he could make recommendations concerning which bills to pay and when, but maintains that he had no authority to determine how to spend Solvay Iron's money and that John Maestri made all final decisions. (Dkt. No. 163-10, ¶ 13). Regarding his responsibility with respect to accounts payable, Ormsby explains that he

> would review the accounts payable log and give Defendant J. Maestri the log with [his] suggestions of which creditors to pay and how much to pay the creditors. Defendant J. Maestri would review the log, make a check mark next to those bills he wanted to pay, strike any bills he did not want to pay and, on occasion, he

---

[15] Sheila and John Maestri object to the Shatrau and Ormsby affidavits on the basis that they contradict prior deposition testimony. (Dkt. No. 174, at 21 n.2). None of the purported contradictions, however, are material.

> would write the dollar amounts to be paid to the creditor. [J. Maestri] would return the accounts payable log to [him (Ormsby)] or to Controller Sarah Shatrau with a request to issue the checks.

(Dkt. No. 163-10, ¶ 16).

## III.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Upon cross-motions for summary judgment, the Court must "in each case constru[e] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

Where a party proceeds pro se, the Court must read his or her submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

Sheila Maestri seeks summary judgment dismissing the Fifth, Sixth, Seventh, and Ninth Causes of Action. (Dkt. No. 161). Plaintiffs seek summary judgment against Sheila and John

Maestri and Kelly Ormsby, entry of judgment in the amount of $1,186,108.70, and an order allowing Plaintiffs to submit an application for attorneys' fees and costs they incurred after the filing of the instant motion. (Dkt. No. 163).

### B.      Plan Assets and Fiduciary Status

The Fifth and Sixth Causes of Action allege that Defendants Sheila Maestri, John Maestri, and Kelly Ormsby breached their fiduciary duties with respect to plan assets, in violation of ERISA §§ 406, 409, and 515 (codified at 29 U.S.C. §§ 1106, 1109, 1145). Before reaching the merits of Plaintiffs' claims, the Court must determine whether the unpaid contributions constitute plan assets and whether the individual defendants were acting as fiduciaries under ERISA.

### 1.      Plan Assets

"ERISA expressly authorizes civil actions against plan fiduciaries in their personal capacity for breaches of their fiduciary duties with respect to plan asset management." *Sullivan v. M.A.C. Design Corp.*, No. 14-cv-1846, 2015 WL 5518456, at *2, 2015 U.S. Dist. LEXIS 124465, at *6 (E.D.N.Y. Sept. 17, 2015) (citing 29 U.S.C. §§ 1109(a), 1132(a)(2); *Finkel v. Romanowicz*, 577 F.3d 79, 82 n.4 (2d Cir. 2009)). ERISA does not define "assets," and the Second Circuit has held that, in general, unpaid employer contributions are not assets under ERISA. *In re Halpin*, 566 F.3d 286, 289–90 (2d Cir. 2009). Parties to a collective bargaining agreement are, however, "free to contractually provide for some other result." *Id.* at 290. The collective bargaining agreements in this case specify that withheld contributions are plan assets: "*Title to all monies paid into and/or due and owing to the Fund shall be vested in and remain exclusively in the Trustees of the Fund*; *outstanding and withheld contributions constitute plan assets*." (Dkt. No. 163-8, at 186; Dkt. No. 163-8, at 7, ¶ 24). Defendants have not adduced evidence calling this fact into question and do not contend otherwise. (Dkt. No. 161-12, at 12).

Thus, beginning in June 2012, when Solvay Iron failed to remit to the Plaintiff funds the contributions it owed for hours worked by covered employees, those withheld contributions constituted plan assets.

### 2.     Fiduciary Status

"'In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'" *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). "Fiduciaries under ERISA are those so named in the plan, or those who exercise fiduciary functions." *In re Citigroup Erisa Litig.*, 104 F. Supp. 3d 599, 613 (S.D.N.Y. 2015). ERISA identifies an individual "as a fiduciary with respect to a plan to the extent" the individual "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Congress intended ERISA's definition of fiduciary 'to be broadly construed'" and functional. *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987)); *see Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."). "The Supreme Court has emphasized the limiting effect of the statutory phrase 'to the extent' because an ERISA fiduciary 'may wear different hats.'" *Patrico v. Voya Fin., Inc.*, No. 16-cv-7070, 2017 WL 2684065, at *2, 2017 U.S. Dist. LEXIS 95735, at *7 (S.D.N.Y. June 20, 2017) (quoting *Pegram*, 530 U.S. at 225). Thus, "'a person may be an ERISA fiduciary with respect to certain matters but not others'; fiduciary status exists only 'to the extent' that the person 'has or exercises the described authority or

responsibility' over a plan." *Coulter*, 753 F.3d at 366 (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)).

As an initial matter, there is evidence that the plan assets at issue in this case were commingled with funds in Solvay Iron's operating account, (*see* Dkt. No. 163-3, at 1–84 (M&T Bank records for the "Solvay Iron Works Inc. Operating Account"); *see also* Dkt. No. 163-12, at 71; Dkt. No. 163-3, at 35 (records reflecting Solvay Iron's receipt of payment for bargaining unit work and deposit of payment into its operating account)), from which Solvay Iron paid other creditors (*see* Dkt. No. 163-3, at 35 (November 13, 2012 "M&T Comm Card Payment")), and over which, Plaintiffs claim, the individual Defendants exercised authority or control. The individual Defendants do not appear to dispute that plan assets were commingled with other funds in Solvay Iron's operating account. It is the individual Defendants' alleged management or disposition of plan assets in Solvay Iron's operating account that is at issue in this case.

"'[M]anagement or disposition' . . . [of ERISA plan assets] refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Finkel*, 577 F.3d at 86 (2d Cir. 2009) (citation omitted). The fact that an individual "was an officer of a company," "was 'authorized to sign checks on the Company's account,.' and had "some general knowledge that deductions were made from employees' wages" is insufficient to render him an ERISA fiduciary absent any "responsibility for determining which of the company's creditors would be paid or in what order." *Finkel*, 577 F.3d at 86 (quoting *LoPresti*, 126 F.3d at 40 (finding "[o]f equal if not more import [than signing checks on the company's commingled account] . . ." is whether the individual "had a role in determining which bills to pay, in that [the individual] decided which creditors were to be paid out of the Company's general account . . . and when those creditors were to be paid")).

In *LoPresti*, the plaintiff union sued the defendant company and its sole shareholders and officers, Donald and John Terwilliger, alleging that the defendants violated the collective bargaining agreement by failing to forward to the union contributions they had deducted from employee paychecks and maintained in the company account from which they paid creditors. 126 F.3d at 36–38. Donald and John Terwilliger were the only signatories on the company account and "signed multiple checks which were drawn on [the] [c]ompany account, including checks which were forwarded to the Union." *Id*. at 37, 40. Following a bench trial, the district court found that the individual defendants were not fiduciaries under ERISA and entered judgment in their favor. *Id*. at 37. The union appealed and the Second Circuit reversed as to Donald Terwilliger. *Id*. at 43. The Second Circuit found that "[b]y focusing on whether the Terwilligers were administrators of the Funds . . . the district court overlooked the fact that an individual also may be an ERISA fiduciary by . . . 'exercis[ing] *any* authority *or* control respecting management *or* disposition of [plan] assets." *Id*. at 40 (alteration in original) (quoting 29 U.S.C. § 1002(21)(A)(i), (iii)).

Next, the Circuit examined the individual defendants' roles in paying company creditors and determined that Donald was a fiduciary:

> Donald had a role in determining which bills to pay, in that he decided which creditors were to be paid out of the Company's general account (which, during the relevant time frame, included employee Fund contributions), and when those creditors were to be paid . . . . Donald's commingling of plan assets with the Company's general assets, and his use of those plan assets to pay Company creditors, rather than forwarding the assets to the Funds means that he "exercised[d] . . . authority or control respecting . . . disposition of [plan] assets," and hence is a fiduciary for purposes of imposing personal liability under ERISA.

*Id*. at 40 (internal quotation marks omitted) (quoting 29 U.S.C. § 1002(21)(A)). The Circuit, however, affirmed the district court's finding that John Terwilliger was not a fiduciary. *Id*. at 40–

41. The difference, the Circuit explained, was that John Terwilliger, though he was authorized to sign checks and "had some general knowledge that deductions were made from employees' wages," was "primarily a production person with no responsibility for determining which of the company's creditors would be paid or in what order." *Id*. at 40 (internal quotation marks omitted). The Circuit therefore concluded that "the record does not support a finding that John performed any of the functions enumerated in § 1002(21)(A) so as to render him personally liable for breach of fiduciary duty under ERISA." *Id*. at 41.

### a.     John Maestri

It is undisputed that John Maestri was the chief executive officer and majority shareholder of Solvay Iron. Plaintiffs assert that John Maestri determined which of Solvay Iron's bills to pay as well as when and whether to pay contributions to the Plaintiff Funds. (Dkt. No. 163-1, ¶¶ 36–37). Ormsby states that he was "involved in accounts payable" but that he "did not have the authority to make final decisions." (Dkt. No. 163-10, ¶ 16). Ormsby explains that he suggested which creditors to pay and how much to pay them but that John Maestri "made those decisions and authorized all payments to creditors," and that the employees responsible for issuing checks "printed only those checks approved by" John Maestri. (Dkt. No. 163-10, ¶ 16). Ormsby avers that John Maestri "decided to pay the insurance premiums, material suppliers, the employees' wages, himself and other overhead expenses but to leave employee's fringe benefit contributions and Plaintiffs unpaid." (Dkt. No. 163-10, ¶ 17).

John Maestri contends that he "relinquished control over operations of Solvay Iron when Mr. Ormsby came on board in late 2011" and notes that Ormsby "signed many contracts on behalf of Solvay Iron . . . including the collective bargaining agreements with the unions." (Dkt.

No. 174, at 14; Dkt. No. 163-10, at 69).[16] During his deposition, John Maestri testified that he and Ormsby discussed Solvay Iron's finances regularly, including its outstanding bills, but that they did not discuss which creditors to pay, because Ormsby "did that." (Dkt. No. 174-7, at 20). John Maestri further testified, however, that if he was "close to a supplier" and got a call from that supplier requesting payment, he would give that supplier money "as we went along" to keep the supplier "happy." (Dkt. No. 174-7, at 19–20).

In support of his contention that Ormsby was responsible for deciding which creditors to pay, John Maestri also cites the March 16, 2013 Board Minutes, which state: "Accounts payable system discussed. Unanimous agreement that [Kelly Ormsby] is ably handling the acct payable." (Dkt. No. 174-3, at 36). Under "Action," the Board Minutes state: "It was suggested that [John Maestri] refer invoice issues to [Kelly Ormsby] for detailed attention." (Dkt. No. 174-3, at 36). The evidence, however, that Ormsby was "handling" accounts payable and received invoices and that John Maestri did not discuss which creditors to pay because Ormsby "did that," does not speak to the issue of who actually controlled the company funds. Additionally, it is undisputed, that John Maestri was Solvay Iron's majority shareholder, that he had authority and control over Solvay Iron's bank accounts, and that he paid suppliers to keep them "happy." Thus, even viewed in the light most favorable to John Maestri, the evidence shows that John Maestri exercised management or control over plan assets. (Dkt. No. 174-7, at 19–20).  *See NYSA-ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 202 (S.D.N.Y. 1999) ("Sabato

---

[16] Plaintiffs argue that, because John Maestri delegated accounts payable authority to Ormsby, which Ormsby denies included any discretion or decision-making authority, John Maestri is liable for Ormsby's failure to remit contributions on the ground that he failed to monitor Ormsby's activities. (Dkt. No. 163-15, at 16–19). As Defendants note, however, (Dkt. No. 174, at 24), none of the cases Plaintiffs cite relate to the factual context of the present case, i.e., a company's failure to remit contributions under the terms of a collective bargaining agreement. *See*, *e.g.*, *Bennett v. Manufacturers & Traders*, No. 99-cv-827, 2005 WL 2896962, at *7, 2005 U.S. Dist. LEXIS 40592, at *17 (N.D.N.Y. Nov. 2, 2005) (discussing alleged ERISA violations by trustees of profit sharing plans); *Liss v. Smith*, 991 F. Supp. 278, 309 (S.D.N.Y. 1998) (discussing fiduciary responsibilities of union president and the power to appoint trustees). As Plaintiffs failed to cite relevant case law for this proposition, the Court does not address this argument at this time.

Catucci clearly had managerial discretion and control over all of Salco. During the entire period of Salco's debt to the Fund, he was the corporation's President and controlling shareholder. He ran the corporation and make [sic] all decisions on payments by Salco."). Accordingly, Plaintiffs are entitled to summary judgment as to John Maestri's fiduciary status.

b.      Sheila Maestri

It is undisputed that Sheila Maestri was a member of Solvay Iron's board and served as secretary and treasurer. Sheila Maestri avers that her duties included taking minutes at board meetings and "discussed irregularities in the Solvay Iron Records with . . . external accountants." (Dkt. No. 161-1, 16). In her declaration, Sheila Maestri states that she was not a shareholder or employee of Solvay Iron and had no "discretion, authority or control over which of Solvay Iron's creditors were paid or not paid at any time." (Dkt. No. 161-1, ¶¶ 3–4, 7). Based on this evidence, Sheila Maestri argues that she is entitled to summary judgment.

Plaintiffs, however, argue that Sheila Maestri had a role in determining how Solvay Iron spent its money and which of its creditors to pay. There is evidence, for instance, that she recommended payment of an employee's college tuition (Dkt. No. 163-12, at 54), and payment to two creditors, (*id*. at 55 (directing payment to Mackenzie Hughes); Dkt. No. 161-7, at 3 (telling Solvay Iron controller Sarah Shatrau that she wanted "to make sure [Ormsby] gets paid back for what he's paid for fuel" and instructed Shatrau to "[g]et him paid back this week if we can afford it"). However, Shatrau asserted in her affidavit that before Solvay Iron paid any bills, the procedure was "to itemize the outstanding invoices (creditor and amount)" and present the itemization to Ormsby, who, in turn, would present it to John Maestri.  (Dkt. No. 163-12, ¶ 6). Thus, even viewing the facts in the light most favorable to Plaintiffs, the evidence shows, at best, that Sheila Maestri made recommendations regarding what to pay; there is no evidence that Sheila Maestri was the one to decide whether Solvay Iron could "afford" to pay any bill she

20

recommended be paid.  For example, even though Sheila Maestri recommended that Solvay Iron pay Shatrau's tuition, it was John Maestri who approved that recommendation and directed payment. (Dkt. No. 163-12, at 54). Sheila Maestri was the board secretary and treasurer, she took meeting minutes, (Dkt. No. 163-3, at 172), and heard the financial reports at monthly board meetings (Dkt. No. 163-3, at 181), discussed Solvay Iron's finances with Shatrau, attended production meetings[17] on occasion (Dkt. No. 163-12, at 44–45), and discussed with John Maestri and Ormsby Solvay Iron's debt to Plaintiffs and how to pay it down. (Dkt. No. 163-12, at 51). It is well settled that "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). Thus, in the absence of evidence that Sheila Maestri had authority or control beyond recommending, in a few instances, that certain creditors be paid,  and no evidence that she had any authority or control over the funds in Solvay Iron's operating account, no factfinder could conclude that Sheila Maestri had any authority with respect to plan assets. *Cf.*, *Pension Ben. Guar. Corp. v. Solmsen*, 671 F. Supp. 938, 944–45 (E.D.N.Y. 1987) ("Most significantly, defendant was responsible for authorizing and making payments to the Plan. According to his own testimony, he exercised discretion in declining to authorize and make payments when the bank balance was not 'sufficient.' These acts show defendant's discretionary authority as to the management and administration of the Plan and the disposition of its assets.").[18]

Accordingly, Sheila Maestri's motion for summary judgment is granted as to her fiduciary status and Plaintiffs' cross-motion for summary judgment is denied.

---

[17] Shatrau testified that at production meetings, project schedules and progress were discussed. (Dkt. No. 163-12, at 46).

[18] Plaintiffs also rely on John Maestri's assignment of power of attorney to Sheila Maestri as a basis for fiduciary status. Citing *In re Alan G.W.*, 29 N.Y.S.3d 755, 757 (N.Y. Sup. 2016), Sheila Maestri notes that under New York law, "a fiduciary cannot delegate his fiduciary powers by granting a general power of attorney." (Dkt. No. 174, at 23). Plaintiffs did not reply to this argument and the Court finds no basis for concluding that the power of attorney raises a material issue of fact as to whether she was a fiduciary with respect to the Plaintiff Funds.

### c.   Kelly Ormsby

Plaintiffs contend that Kelly Ormsby, who was chief operating officer and president of Solvay Iron, possessed authority and control over plan assets and the bank accounts that held those plan assets. (Dkt. No. 163-15, at 14). Ormsby states that he made "suggestions" regarding "which creditors to pay and how much to pay the creditors" and presented an accounts payable log to John Maestri, who would review the log, "make a check mark next to those bills he wanted to pay, strike any bills he did not want to pay and, on occasion, . . . write the dollar amounts to be paid to the creditor." (Dkt. No. 163-10, ¶ 16). Ormsby was the signatory to the CBA, and, as discussed above, John Maestri testified that Ormsby was responsible for handling accounts payable and deciding which creditors to pay. (Dkt. No. 174-7, at 20). There is, therefore, a material issue of fact concerning what authority, if any, Ormsby had over plan assets. *See Coleman v. BMC Const. Corp.*, 425 F. Supp. 2d 477, 483–84 (S.D.N.Y. 2006) (denying the plaintiff union funds' motion for summary judgment where there were factual issues concerning the individual defendant's "degree of control over company funds").

### C.   Fifth Cause of Action: ERISA § 406 – Prohibited Transactions

The Fifth Cause of Action alleges that Sheila and John Maestri and Kelly Ormsby, as fiduciaries and parties in interest, engaged in prohibited transactions in violation of ERISA § 406(a). (Dkt. No. 63, at 17). Specifically, Plaintiffs assert that a series of checks[19] John Maestri received from Solvay Iron between July 2012 and October 2013 totaling $469,663.20,[20] Sheila Maestri's receipt of $2,249.00, and Kelly Ormsby's receipt of $53,930.11 were prohibited transactions under ERISA. (Dkt. No. 163-1, ¶¶ 28–30; Dkt. No. 163-2, at 104–34).

---

[19] Kelly Ormsby states that Solvay Iron issued these checks at John Maestri's direction, and Sheila Maestri deposited them in John Maestri's accounts. (Dkt. No. 163-10, ¶ 35).

[20] John Maestri notes that one of the checks is not payable to him, but to Merrill Lynch. (Dkt. No. 174-1, ¶ 28; Dkt. No. 163-2, at 128).

ERISA § 404(a)(1) requires an ERISA fiduciary to "discharge his [or her] responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use." *Tibble v. Edison Int'l*, 135 S.Ct. 1823, 1828 (2015) (quoting 29 U.S.C. § 1104(a)(1)). "Section 406 of ERISA supplements the general fiduciary obligations set forth in § 404 by prohibiting certain categories of transactions believed to pose a high risk of fiduciary self-dealing." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006). ERISA § 406(a)(1) provides, in relevant part:

> (a) Transactions between plan and party in interest
>
> . . .
>
>> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>>
>>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>>>
>>> (B) lending of money or other extension of credit between the plan and a party in interest;
>>>
>>> (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]
>>>
>>> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

29 U.S.C. § 1106(a)(1).

### 1.   Parties in Interest

ERISA defines "party in interest" as:

> (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
>
> . . .
>
> (E) an owner, direct or indirect, of 50 percent or more of—
>
>> (i)    the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation.

(ii) the capital interest or the profits interest of a partnership, or

(iii) the beneficial interest of a trust or unincorporated enterprise,

which is an employer or an employee organization described in subparagraph (C) or (D);

(F) a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E); [or]

. . .

(H) an employee, officer, [or] director . . . .

29 U.S.C. § 1002(14). Paragraph (15) explains that the "term 'relative' means a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." *Id*. § 1002(15).

As discussed, Plaintiffs have established that John Maestri is a fiduciary, further, as the owner of Solvay Iron, he is also party in interest, as is his daughter Sheila (relative). Plaintiffs assert that Ormsby, who was employed by Solvay Iron and was president and chief operating officer, is a party in interest as "an officer and director." (Dkt. No. 163-15, at 22).

## 2. Liability

"To state a claim under ERISA § 406(a)(1) . . . plaintiffs must allege that the defendant is a fiduciary; the defendant caused the plan to engage in one of the prohibited transactions set forth in § 406(a)(1); the transaction was "between the plan and a 'party in interest'" (for § 406(a)(1)(A)[–](C)) or involved plan assets (for § 406(a)(1)(D)); and the defendant knew or should have known that the transaction was prohibited." *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284, 2017 WL 3701482, at *4, 2017 U.S. Dist. LEXIS 137115, at *13 (S.D.N.Y. Aug. 25, 2017). "Section 406(b) [is to] be broadly construed, *see Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984), and . . . liability. . . imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir. 1979)).

"When a fiduciary violates the rules set forth in § 406(a)(1), § 409 of ERISA renders [the fiduciary] personally liable for any losses incurred by the plan, any ill-gotten profits, and other equitable and remedial relief deemed appropriate by the court. But in order to sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction." *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (citing 29 U.S.C. § 1109(a)). "The transactions enumerated in § 406(a)(1) are per se violations of ERISA regardless of the motivations which initiated the transaction, the prudence of the transaction, or the absence of any harm resulting from the transaction." *Liss v. Smith*, 991 F. Supp. 278, 307 n.30 (S.D.N.Y. 1998). Section 1106(a) requires that the fiduciary "knows or should know" the facts that would make the transaction prohibited. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000).

Furthermore, under ERISA § 502(a)(3), a plaintiff plan may bring an equitable claim for relief, based on a violation of § 406(a), against parties in interest, even though they are non-fiduciaries. *Harris Tr.*, 530 U.S. at 246 (explaining that ERISA § 502(a)(3) authorizes "'appropriate equitable relief' for the purpose of 'redress[ing any] violations or . . . enforc[ing] any provisions' of ERISA or an ERISA plan." (quoting *Peacock v. Thomas*, 516 U.S. 349, 353 (1996)); *see also Haley v. Teachers Ins. & Annuity Ass'n of Am.*, No. 17-cv-855, 2018 WL 1585673, at *8, 2018 U.S. Dist. LEXIS 52138, at *20–21 (S.D.N.Y. Mar. 28, 2018) ("Where plaintiffs seek to recover profits from a nonfiduciary which were derived from allegedly knowing participation in a § 406(a) violation, courts have permitted disgorgement claims to proceed under § 502(a)(3)."). The Supreme Court has explained that, in order to hold "a transferee of ill-gotten trust assets" liable,

> the transferee must be demonstrated to have had actual or
> constructive knowledge of the circumstances that rendered the

transaction unlawful. Those circumstances, in turn, involve a showing that the plan fiduciary, with actual or constructive knowledge of the facts satisfying the elements of a § 406(a) transaction, caused the plan to engage in the transaction.

*Harris Tr.*, 530 U.S. at 251.

### a.    John Maestri

Plaintiffs claim that John Maestri engaged in prohibited transactions by diverting plan assets via a series of checks totaling $469,663.20 from the Solvay Iron operating account, and depositing those assets in his own account. (Dkt. No. 163-2, at 104–32). John Maestri notes that one of these checks is not payable to him, but to Merrill Lynch, in the amount of $10,000. (Dkt. No. 163-2, at 128).  John Maestri, as chief executive officer and majority shareholder, is, as discussed, a fiduciary and a party in interest. Further, it is uncontroverted that John Maestri knew during the time period when he received the checks—July 2012 through October 2013—that Solvay Iron owed contributions to the Plaintiff funds and that plan assets were commingled in Solvay Iron's operating account. (Dkt. No. 163-10, ¶ 32). Finally, there is evidence that John Maestri directed the issuance of theses checks, (Dkt. No. 163-10, ¶ 35), and therefore "caused the plan to engage in the transaction." *Harris Tr.*, 530 U.S. at 128. These transactions were therefore per se violations of ERISA and Plaintiffs are entitled to summary judgment against John Maestri under § 406(a)(1).

John (and Sheila Maestri) also argue that they should not be held liable under ERISA § 406 because they loaned money to Solvay Iron. John Maestri asserts that he loaned Solvay Iron approximately $441,000 in 2013. (Dkt. No. 174-6, at 56). Sheila Maestri asserts that she loaned Solvay Iron $12,754.66 in 2013. (*Id*.). Under 29 U.S.C. § 1108(a), the Secretary of Labor is authorized to "grant a conditional or unconditional exemption of any fiduciary or transaction, or class of fiduciaries or transactions, from all or part of the restrictions imposed by" ERISA § 406.

These exemptions are outlined in 29 U.S.C. § 1108(b) and 29 C.F.R. Part 2550, but Defendants have not identified which, if any of the exemptions might apply. *See*, *e.g.*, 29 C.F.R. § 2550.408b–1 ("General Statutory Exemption for Loans to Plan Participants and Beneficiaries Who Are Parties in Interest with Respect to the Plan"); *id.* § 2550.408b–2 ("General Statutory Exemption for Services or Office Space"). Accordingly, their argument is unavailing.

### b.      Sheila Maestri

Plaintiffs challenge Sheila Maestri's receipt of $2,000.00 in plan assets in December 2012 (Dkt. No. 263-2, at 138; Dkt. No. 163-3, at 41) and $249.00 January 2013 (Dkt. No. 163-2, at 136; Dkt. No. 163-3, at 43). Sheila Maestri concedes she is a party in interest but seeks summary judgment and questions whether "such a relatively small amount of money"— $2,246.00—can be considered barred by ERISA's prohibition on self-dealing, particularly where, as here, she had "already expended that amount of her personal funds on Solvay Iron business." (Dkt. No. 174, at 27). ERISA § 406 imposes liability for the prohibited transfer of "*any* assets of the plan." 29 U.S.C. § 1106(a)(1). Thus, as it is undisputed that the $2,249.00 Sheila Maestri received constituted plan assets, it falls within ERISA § 406. Accordingly, the Court turns to the merits.

Sheila Maestri maintains that she knew nothing of Solvay Iron's debt to the Plaintiff funds until, at the earliest, July 2013—more than six months after she received the checks totaling $2,249.00. (Dkt. No. 174-1, ¶ 35; Dkt. No. 174-3, at 44 (July 13, 2013 board minutes "Accounts payable: Local 60: [Solvay Iron] owes Local 60 100,000+")). She further maintains that she knew nothing of Solvay Iron's banking practices or financial information, condition, or paying the wages or benefits of covered employees. (Dkt. No. 163-3, 189–90). Thus, she has adduced evidence, which, if credited, indicates that she lacked actual or constructive knowledge of the circumstances that rendered her receipt of $2,249.00 unlawful. Ormsby avers that because

either he or John Maestri presented an accounts payable log reflecting "the debt with the Plaintiffs" to the board at (or before) every monthly meeting, Sheila Maestri "knew how much money was in the bank and knew about [Solvay Iron's] outstanding bills." (Dkt. No. 163-10, ¶ 32). Such evidence, if credited, would allow a factfinder to infer that Sheila Maestri possessed at least constructive knowledge that she was receiving plan assets.[21]

### c. Kelly Ormsby

Plaintiffs have presented evidence that Ormsby received $53,390.11 from Solvay Iron between May 2012 and September 2013. (Dkt. No. 163-2, at 71–72). Even assuming Kelly Ormsby is not a fiduciary, because it is undisputed that as chief operating officer, he was a party in interest, that he was fully familiar with Solvay Iron's accounts payable, including Solvay Iron's debt to the Plaintiff funds, and that he received $53,390 in plan assets, he may be liable under ERISA § 406. *See Metzler v. Solidarity of Labor Orgs. Health & Welfare Fund*, No. 95-cv-7247, 1998 WL 477964, at *8, 1998 U.S. Dist. LEXIS 12565, at *29 (S.D.N.Y. Aug. 14, 1998) ("In order for a particular transaction to run afoul of § 406(a)(1)(D), it must involve (1) a transfer (2) to a party in interest (3) of plan assets."). There are, however, issues of fact concerning whether a fiduciary with knowledge of the circumstances that rendered the transaction unlawful caused the transfer of plan assets to Kelly Ormsby. Indeed, Plaintiffs have not identified who "caused" this transaction. Accordingly, summary judgment is inappropriate.

### D. Sixth Cause of Action – ERISA § 515

In the Sixth Cause of Action, Plaintiffs allege that John and Sheila Maestri and Kelly Ormsby were (i) fiduciaries with respect to the Plaintiff Plans, (ii) received "sums of money

---

[21] Plaintiffs appear to seek to hold Sheila Maestri liable for her part in endorsing and depositing the checks issued to John Maestri into John Maestri's account. (Dkt. No. 167-2, at 9). There is no evidence, however, that this benefitted Sheila Maestri in any way, that it involved any discretionary authority or control, or that she was anything more than an intermediary.

related to construction projects intended to pay . . . the wages and benefits of employees furnishing and supplying the labor," (iii) that these monies "constitute assets of the Plaintiff Plans," (iv) that Defendants determined which creditors Solvay Iron would pay, and (v) that Defendants failed to timely remit $183,329.84 in contributions, and failed to remit $840,257.60 in contributions to the Plaintiff Funds. (Dkt. No. 63, ¶¶ 74–86). Plaintiffs further allege that by using plan assets for purposes other than the interests of the Plaintiff Funds, and allowing the transfer or diversion of the Plaintiff Funds' assets, they have breached their fiduciary duties of loyalty and prudence, in violation of ERISA § 404, as fiduciaries, failed to make contributions under the terms of the Plaintiff Plans, in violation of ERISA § 515, and, under § 409 of ERISA are "personally liable to make good to such plan any losses to the plan resulting from such breach." (Dkt. No. 63, ¶¶ 90–92). Under § 515 of ERISA,

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

To the extent Defendants allocated monies from Solvay Iron's operating account, which contained plan assets, to expenses rather than to the Plaintiff funds, they breached their duties of loyalty and prudence under ERISA § 404(a). *Pension Benefit Guaranty Corp. v. Solmsen,* 671 F. Supp. 938, 946 (E.D.N.Y. 1987) ("Defendant allocated available monies to corporate expenses rather than the . . . fund, thereby breaching his duty to act solely in the interests of the Plan's participants . . . in violation of 29 U.S.C. §§ 1104(a)(1)."). Given John Maestri's fiduciary status, it follows, under the facts of this case, that Plaintiffs are entitled to summary judgment against him under ERISA § 515 for the unpaid and untimely paid contributions. As there is no evidence from which a fact-finder could conclude that Sheila Maestri was a fiduciary, she is entitled to

summary judgment dismissing this cause of action. There are, however, questions of fact concerning Ormsby's fiduciary status. Plaintiffs' motion for summary judgment as to Ormsby under § 515 is therefore denied.[22]

### E.     Seventh Cause of Action – New York Law

Sheila Maestri seeks summary judgment dismissing the Seventh Cause of Action, which alleges that "Defendants abused their position as fiduciaries by permitting, directing or instigating this deduction and retention, use or diversion of their employees' monies in a manner contrary to their fiduciary obligations and their action is a breach of trust under Article 3-A of the New York Lien Law," Labor Law, and Penal Law. (Dkt. No. 63, ¶¶ 101–104). Sheila Maestri argues that she cannot be held personally liable under New York Labor Law because she is not an employer. (Dkt. No. 161-12, at 15). Plaintiffs oppose summary judgment but have not in the Amended Complaint, or in their opposition to Sheila Maestri's motion for summary judgment, identified a provision of the New York Labor Law or Penal Law under which they intend to proceed or disputed her argument that she is not an employer. Instead, citing New York Business Corporation Law § 701, Plaintiffs argue that Sheila Maestri is liable to them "by virtue of her position as a director of an insolvent corporation."[23] (Dkt. No. 167-2, at 25). Plaintiffs do not

---

[22] Plaintiffs argue that even assuming Ormsby "made the decisions to misuse and diver Plaintiffs' plan assets, the fact remains that [John Maestri] hired . . . Ormsby and delegated to him the task of handling Plaintiffs' plan assets." (Dkt. No. 163-15, at 19). They further argue that John Maestri and Sheila Maestri "failed to take reasonable and prudent steps to monitor . . . Ormsby . . . and to determine whether he was fulfilling the fiduciary responsibilities owed to Plaintiffs." (*Id.* at 90–20). While this provides a basis for liability against John Maestri, as he is a fiduciary, in the absence of evidence that Sheila Maestri was a fiduciary with respect to the Plan Funds, she cannot be held liable for failing to monitor Ormsby. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760–61 (S.D.N.Y. 2003) (rejecting argument that the defendant supervisor of ERISA fiduciary was also an ERISA fiduciary explaining that "the plaintiffs' argument goes too far" and " would make any supervisor of an ERISA fiduciary also an ERISA fiduciary," a proposition for which the plaintiffs had  provided no statutory or decisional support").

[23] Section 701 states:

> Subject to any provision in the certificate of incorporation authorized by paragraph (b) of section
> 620 (Agreements as to voting; provision in certificate of incorporation as to control of directors) or
> by paragraph (b) of section 715 (Officers), the business of a corporation shall be managed under

explain how (or whether) this argument bears any connection to their state law claims. Indeed, Plaintiffs make no reference in their opposing papers to the New York Labor Law or Penal Law.[24] Accordingly, the Court deems this claim as against Sheila Maestri abandoned. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998)).

### F.     Ninth Cause of Action – Injunctive Relief

Sheila Maestri moves for summary judgment dismissing the ninth cause of action, in which Plaintiffs seek an order enjoining her from further violating ERISA. (Dkt. No. 161-12, at 23; Dkt. No. 63, at 27). In view of the issues of material fact with respect to the Fifth Cause of Action, ERISA § 406(a)(1), Sheila Maestri's motion is denied.

### G.     Damages

Although Plaintiffs are entitled to summary judgment as to John Maestri, as there are issues of material fact requiring trial as to Sheila Maestri and Ormsby, and all claims against Defendants Chemotti and Bert Maestri remain pending, the Court declines to address Plaintiffs' arguments concerning damages attorneys' fees.

---

the direction of its board of directors, each of whom shall be at least eighteen years of age. The certificate of incorporation or the by-laws may prescribe other qualifications for directors.

N.Y. Bus. Corp. Law § 701. To the extent Plaintiffs claim that this provision renders Sheila Maestri liable as a fiduciary under ERISA, they have filed no case law supporting such a claim.

[24] In a footnote to their argument concerning Sheila Maestri's status as an ERISA fiduciary and "trust fund assets," Plaintiffs cite several cases that allude to the New York Lien Law. (Dkt. No. 167-2, at 17 n.6 (citing, *inter alia*, *People v. Rallo*, 46 A.D.2d 518, 527–28 (4th Dep't 1975), *Nat'l Surety Corp. Fishkill Nat'l Bank*, 61 Misc. 2d 579, 586 (1969)). However, they neither contend Sheila Maestri is liable under the Lien Law nor make any other reference to it in their papers.

## IV.     SUPPLEMENTAL APPLICATION FOR ATTORNEYS' FEES AND COSTS

In a Memorandum Decision and Order entered on March 28, 2017, the Court granted

Plaintiffs' motion for default judgment against Defendant Solvay Iron and entered partial

judgment in favor of Plaintiffs, including an award of attorneys' and legal assistants' fees and

costs. (Dkt. No. 134). As there were duplicative time entries that required further explanation

and Plaintiffs had requested permission to file a supplemental application for any attorneys' fees

and costs they incurred for the period after their filing of the motion for default judgment, the

Court made a partial award of attorneys' and legal assistants' fees and allowed Plaintiffs to

submit additional evidence regarding the problematic entries along with their supplemental

application for attorneys' and legal assistants' fees. (Dkt. No. 134, at 19, 22). Subsequently,

Plaintiffs filed an affidavit by their attorney explaining the duplicative entries as well as an

application for attorneys' fees for the period following their motion for default judgment (March

29, 2016 to February 28, 2017). (Dkt. No. 148). The Court has carefully reviewed Plaintiffs'

request, which is supported by documentary evidence, including detailed billing records, and

finds, for the reasons stated in the Memorandum Decision and Order (Dkt. No. 134, at 17–21),

Plaintiffs are entitled to an award of $48,479.88 in attorneys' and paralegal fees and costs for the

period May 1, 2013 through March 29, 2016 and $72,898.45 in attorneys' and paralegal fees and

costs for the period March 29, 2016 to February 28, 2017.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Sheila Maestri's motion for summary judgment (Dkt.

No. 161) is **GRANTED** with respect to the Sixth Cause of Action (ERISA § 406(a)(1)) and

Seventh Cause of Action (New York Law claims); and it is further

**ORDERED** that the Sixth and Seventh Causes of Action as to Defendant Sheila Maestri are **DISMISSED** with prejudice; and it is further

**ORDERED** that Defendant Sheila Maestri's motion for summary judgment (Dkt. No. 161) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 163) is **GRANTED** as to John Maestri's liability under the Fifth and Sixth Causes of Action; and it is further

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 163) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiffs are awarded $48,479.88 in attorneys' and paralegal fees and costs for the period May 1, 2013 through March 29, 2016 and $72,898.45 in attorneys' and paralegal fees and costs for the period March 29, 2016 to February 28, 2017.

**IT IS SO ORDERED**.

Dated: May 11, 2018
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

33